Westlaw.

272 F.3d 625
81 Empl. Prac. Dec. P 40,804, 7 Wage & Hour Cas.2d (BNA) 710
**(Cite as: 272 F.3d 625)**

**H**
Briefs and Other Related Documents

United States Court of Appeals,
Fourth Circuit.

Howard Kevin KNUSSMAN, Plaintiff-Appellee,
and
Kimberly Ann Knussman, on behalf of themselves
and their infant daughter, a/k/a
Riley Paige Knussman, Plaintiff,
v.
State of MARYLAND; David B. Mitchell, Colonel,
individually and in his
official capacity as Superintendent; David
Czorapinski, Captain, individually
and in his official capacity as Assistant Commander
of Aviation; Ronnie P.
Creel, First Sergeant, individually and in his official
capacity as Director of
Flight Operations; Jill D. Mullineaux,
Defendants-Appellants,
and
Maryland State Police, Defendant.

**No. 99-2349.**

Argued Jan. 26, 2001.
Decided Nov. 7, 2001.

Male state police employee brought § 1983 sex discrimination action against state and various officials, alleging that state police violated Family Medical Leave Act (FMLA) and equal protection by denying employee's request for 30-day statutory "nurturing leave" to care for newborn. The United States District Court for the District of Maryland, Walter E. Black, Jr., J., 65 F.Supp.2d 353, vacated jury verdict in employee's favor on FMLA claim, but entered judgment on verdict in employee's favor against state police personnel officer on equal protection claim and approved $375,000 damages award. On personnel officer's appeal, the Court of Appeals, Traxler, Circuit Judge, held that: (1) personnel officer violated equal protection by applying facially neutral infant-care paid leave statute in sexually discriminatory manner; (2) officer was not entitled to qualified immunity; (3) evidence

supported damages award for emotional distress; but (4) award was excessive.

Affirmed in part, vacated in part, and remanded.

Lee, J., sitting by designation, concurred in part and dissented in part.

West Headnotes

**[1] Civil Rights** 🔑1376(3)
78k1376(3) Most Cited Cases
(Formerly 78k214(3))

State government officials performing discretionary function enjoy qualified immunity from liability for civil damages unless: (1) officers' conduct violated federal statutory or constitutional right; and (2) right was clearly established at time of conduct, such that (3) objectively reasonable officer would have understood that conduct violated that right.

**[2] Federal Courts** 🔑776
170Bk776 Most Cited Cases

**[2] Federal Courts** 🔑801
170Bk801 Most Cited Cases

Court of Appeals reviews de novo district court's denial of motion for judgment as matter of law, viewing evidence in light most favorable to non-movant. Fed.Rules Civ.Proc.Rule 50(b), 28 U.S.C.A.

**[3] Civil Rights** 🔑1432
78k1432 Most Cited Cases
(Formerly 78k244)

Although jury may be suited for making factual findings relevant to question of qualified immunity, it is preferable for court, not jury, to answer ultimate legal question of whether defendant is entitled to qualified immunity.

**[4] Constitutional Law** 🔑224(3)
92k224(3) Most Cited Cases

**[4] States** 🔑60.2
360k60.2 Most Cited Cases

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

State personnel officer violated equal protection by denying male employee, solely on basis of his status as father rather than mother of newborn, "primary caregiver" status under state statute granting additional paid leave to primary caregiver of infant; statute was facially neutral, distinguishing only between primary and secondary caregivers for purpose of number of leave days available, but officer applied irrebuttable presumption that mother was primary caregiver. U.S.C.A. Const.Amend. 14; Md.Code, State Personnel and Pensions, § 7-508(a) (1995).

**[5] Constitutional Law** ☞**224(1)**
92k224(1) Most Cited Cases

Gender classification is subject to heightened equal-protection scrutiny and will fail unless it serves important governmental objectives and is substantially related to achievement of those objectives. U.S.C.A. Const.Amends. 5, 14.

**[6] Constitutional Law** ☞**224(1)**
92k224(1) Most Cited Cases

Generalizations about differing talents, capacities, or preferences of males and females are insufficient under Equal Protection Clause as justifications for gender-based rights distinctions. U.S.C.A. Const.Amends. 5, 14.

**[7] Civil Rights** ☞**1376(10)**
78k1376(10) Most Cited Cases
(Formerly 78k214(6), 78k214(3))

Personnel officer for state police was not entitled to qualified immunity in male employee's §1983 equal protection challenge to officer's denial, based solely on employee's status as father rather than mother of newborn, of "nurturing leave" provided by state statute to infant's "primary caregiver"; at time of denial Equal Protection Clause clearly prohibited irrebuttable presumption that only mothers could be primary caregivers. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983; Md.Code, State Personnel and Pensions, § 7-508(a) (1995).

**[8] Federal Courts** ☞**825.1**
170Bk825.1 Most Cited Cases

Court of Appeals reviews for abuse of discretion district court's denial of motion for new trial. Fed.Rules Civ.Proc.Rule 59, 28 U.S.C.A.

**[9] Federal Courts** ☞**763.1**
170Bk763.1 Most Cited Cases

On review of district court's denial of motion for new trial alleging excessiveness of jury's compensatory damages award, Court of Appeals inquires whether: (1) jury's verdict is against weight of evidence, or (2) based on evidence which is false. Fed.Rules Civ.Proc.Rule 59, 28 U.S.C.A.

**[10] Civil Rights** ☞**1463**
78k1463 Most Cited Cases
Embarrassment.
(Formerly 78k273)

Compensatory damages for emotional injuries are recoverable under § 1983. 42 U.S.C.A. § 1983.

**[11] Civil Rights** ☞**1463**
78k1463 Most Cited Cases
(Formerly 78k273)

Section 1983 plaintiff seeking damages for emotional duress must demonstrate that such duress resulted from constitutional violation itself. 42 U.S.C.A. § 1983.

**[12] Civil Rights** ☞**1464**
78k1464 Most Cited Cases
(Formerly 78k274)

Factors in determining whether award of damages for emotional distress for constitutional deprivation is excessive include: medical attention resulting from duress, psychiatric or psychological treatment, degree of distress, factual context in which emotional distress developed, evidence corroborating testimony of plaintiff, nexus between defendant's conduct and distress, mitigating circumstances, if any, physical injuries suffered as result of distress, and loss of income, if any. 42 U.S.C.A. § 1983.

**[13] Civil Rights** ☞**1472**
78k1472 Most Cited Cases
(Formerly 78k273)

Sufficient evidence supported award of emotional distress damages to male state employee who prevailed in §1983 equal protection action challenging state personnel officer's sex-based denial of "primary caregiver" status under state statute providing additional paid leave to primary caregiver of infant, where employee required medical treatment for anxiety and depression in wake of status dispute and clinical psychologist attributed problems to dispute. U.S.C.A. Const.Amend.14; 42 U.S.C.A. § 1983; Md.Code, State Personnel and Pensions, § 7-508(a) (1995).

**[14] Civil Rights** ☞**1473**
78k1473 Most Cited Cases

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

(Formerly 78k274)

Emotional distress damages award of $375,000 was excessive in male state employee's §1983 equal protection action challenging state personnel officer's sex-based denial of "primary caregiver" status under state statute providing additional paid leave to primary caregiver of infant; officer's involvement was limited to initial denial of request for primary caregiver status, and evidence indicated that distress resulted largely from litigation and from administrative process after officer's role ended. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983; Md.Code, State Personnel and Pensions, § 7-508(a) (1995).

**[15] Damages** ⚷**49**

115k49 Most Cited Cases

In general, litigation-induced emotional distress is never a compensable element of damages.

West Codenotes
Unconstitutional as Applied

Md. Code Ann. State Pers. & Pens. §7-508(a)

**\*627 ARGUED:** David Phelps Kennedy, Assistant Attorney General, Baltimore, MD, for Appellants. Robin R. Cockey, Cockey, Brennan & Maloney, Salisbury, MD, for Appellee. **ON BRIEF:** J. Joseph Curran, Jr., Attorney General of Maryland, Betty Stemley Sconion, Assistant Attorney General, Donald E. Hoffman, Assistant Attorney General, Baltimore, MD, for Appellants. Deborah A. Jeon, American Civil Liberties Union Foundation of Maryland, Centreville, MD; Sara L. Mandelbaum, American Civil Liberties Union, New York, NY, for Appellee.

Before WILLIAMS and TRAXLER, Circuit Judges, and LEE, United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed in part, vacated in part, and remanded by published opinion. Judge TRAXLER wrote the majority opinion, in which Judge WILLIAMS joined. Judge LEE wrote an opinion concurring in part and dissenting in part.

**OPINION**

TRAXLER, Circuit Judge:

Howard Kevin Knussman, a trooper in the Maryland State Police, brought an action alleging that the State of Maryland and several individual employees of the Maryland State Police (collectively "the defendants") unlawfully discriminated against him on the basis of his gender, for which he sought recourse under 42 U.S.C.A. § 1983 (West Supp.2000); and that the defendants violated his rights under the Family and Medical Leave Act of 1993 (FMLA), see 29 U.S.C.A. §§ 2601-2654 (West 1999), for which he sought recourse under § 1983 and directly under the FMLA. Following a jury trial and various post- trial motions, judgment in the amount of $375,000 was entered against only one of the defendants--Jill Mullineaux, a civilian employee of the Maryland State Police.

On appeal, Mullineaux contends that she was entitled to qualified immunity. Alternatively, she challenges the verdict on several grounds. We conclude that Mullineaux was not entitled to qualified immunity; however, we find that the award of damages was excessive. Accordingly, we set aside the jury's award of damages and remand for further proceedings on that issue.

**\*628** I.

In 1994, Knussman learned that his wife Kimberly was pregnant. At the time, Knussman held the rank of trooper first class and served as a paramedic on medevac helicopters in the Aviation Division of the Maryland State Police ("MSP"). Unfortunately, Kim's pregnancy was difficult and ultimately resulted in her confinement to bed rest in the latter stages prior to delivery. In October 1994, Knussman submitted a written request to his supervisor asking that Knussman be permitted to take four to eight weeks of paid "family sick leave" to care for his wife and spend time with his family following the birth of his child. [FN1] J.A. 121. Eventually, Knussman was informed by the MSP Director of Flight Operations, First Sergeant Ronnie P. Creel, that there was "no way" that he would be allowed more than two weeks. Creel testified that, at the time of Knussman's request, the Aviation Division was understaffed. According to Knussman, Creel misinformed him that if he wanted more leave, he would be forced to take unpaid leave because the FMLA did not entitle him to further paid leave. Knussman testified that he was unfamiliar with the FMLA because the MSP had failed to provide proper notice to its employees about their rights under the FMLA.

FN1. Maryland law permitted a state employee to use paid sick leave for reasons

other than the employee's own illness, including "for death, illness, or disability in the employee's immediate family." Md.Code Ann., *State Pers. & Pens. § 7-502(b)(2) (1994)*. The statute was later amended and reorganized; however, Maryland law still permits this particular use of a state employee's sick leave. *See* Md.Code Ann., *State Pers. & Pens. § 9-501(b)(2) (1996)*.

In early December, shortly before the Knussmans' daughter was born, Jill Mullineaux, manager of the medical leave and benefit section of the MSP Personnel Management Division, notified all MSP employees of a new Maryland statutory provision that allowed the use of paid sick leave by a state employee to care for a newborn. *See* Md.Code Ann., *State Pers. & Pens. §§ 7- 502(b)(3)*, *7-508 (1994)*. The statute permitted "[p]rimary care givers" to "use, without certification of illness or disability, up to 30 days of accrued sick leave to care for [a] child ... immediately following: ... the birth of the employee's child." Md.Code Ann., *State Pers. & Pens. § 7-508(a)(1)*. A "[p]rimary care giver" was defined as "an employee who is primarily responsible for the care and nurturing of a child." Md.Code Ann., *State Pers. & Pens. § 7-508(a)(1)*. By contrast, a "[s]econdary care giver," *i.e.,* "an employee who is secondarily responsible for the care and nurturing of a child," might use up to 10 days of accrued sick leave without providing proof of illness or disability. Md.Code Ann., *State Pers. & Pens. § 7-508(b)(1)*. [FN2] In contrast to "family sick leave," which required an employee to provide verification of a family member's illness, the new "nurturing leave" provision permitted an employee to use paid sick leave without providing any medical documentation, since this type of leave was not actually related to the illness or disability of the employee or the employee's family. [FN3]

FN2. Section 7-508 has been amended and recodified, and it now provides for the use of up to an aggregate of 40 days of accrued sick leave if two state employees are responsible for the care of a newborn. *See* Md.Code Ann., *State Pers. & Pens. § 9-505(b)(1) (1996)*. Section 7- 508(b)(1), had it been in effect at the time, apparently would have applied to the Knussmans, who were both state employees.

FN3. For ease of reference, we adopt the term "nurturing leave." This term, however, does not appear in the statute.

Believing that this "nurturing leave" might afford him more paid leave than he would receive from his request for "family *629 sick leave," Knussman contacted Mullineaux for additional information about using his accrued sick leave under § 7-508. Specifically, he wanted to know whether he could qualify as a primary care giver under § 7-508(a)(1) and take 30 days of paid sick leave. According to Knussman, Mullineaux informed him that only birth mothers could qualify as primary care givers; fathers would only be permitted to take leave as secondary care givers since they "couldn't breast feed a baby." J.A. 136. Mullineaux, who testified that she was merely passing along the Maryland Department of Personnel's (DOP) view of "primary care giver," denied adopting such a categorical interpretation. [FN4] In any case, Knussman's superior officers in the Aviation Division, having consulted Mullineaux about the untested nurturing leave provision, granted him 10 days of paid sick leave as the secondary care giver under § 7-508(b).

FN4. Mullineaux testified that she never told Knussman that fathers were, as a class, ineligible for primary care giver status. Rather, Mullineaux's version was that she told Knussman, based on information provided by the state Department of Personnel, "that the birth mother was presumed to be the primary care giver and if he wanted to qualify as the primary care giver, he could, if he could provide [supporting] information." J.A. 488.

The Knussmans' daughter was born on December 9, 1994. Kimberly Knussman, however, continued to experience health problems. Before his authorized 10-day leave expired, Knussman contacted Sergeant J.C. Collins, one of his supervisors, and inquired whether his status could be changed to that of primary care giver and his paid sick leave extended to 30 days under section 7-508(a). Knussman explained to Collins that he was the primary care giver for the child because, given his wife's condition following delivery, he was performing the majority of the essential functions such as diaper changing, feeding, bathing and taking the child to the doctor.

David Czorapinski, the Assistant Commander for the Aviation Division during this time, learned of Knussman's inquiry and, unable to reach Mullineaux, gathered some preliminary information on the new law himself. Czorapinski learned that the Maryland DOP

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

intended to take the position that the mother was the primary care giver and the father was secondary. Czorapinski passed this information down the chain-of-command and Knussman was told that it was unlikely that his paid sick leave would be extended under section 7-508(a).

On the day before Knussman was scheduled to return to work, Knussman made a final attempt at obtaining additional sick leave. Sergeant Carl Lee, one of Knussman's immediate superiors, had earlier informed Knussman that although nurturing leave as a primary care giver was probably not an option, Knussman might be eligible for additional paid leave under the family sick leave provision, *see* Md.Code Ann., *State Pers. & Pens.* § 7-502(b)(2), as long as he could demonstrate that it was medically necessary for him to care for his wife. Knussman contacted Mullineaux to find out what information he needed to supply for family sick leave. [FN5] During this conversation, Knussman again discussed his eligibility for nurturing leave as a primary care provider under section 7-508(a) with Mullineaux, who explained that "God made **630** women to have babies and, unless [he] could have a baby, there is no way [he] could be primary care [giver]," J.A. 153, and that his wife had to be "in a coma or dead," J.A. 154, for Knussman to qualify as the primary care giver.

FN5. Knussman subsequently submitted a letter from Kimberly Knussman's doctor in support of his request for family sick leave; however, Mullineaux concluded that the letter was insufficient to justify family sick leave because "it [did not] say what care [Knussman was] going to provide, and it [did not] say that [Knussman] need[ed] to be home ... like it's [Knussman's] choice and not the doctor's requirement." J.A. 827. Although Czorapinski suggested to Knussman that the deficiencies could be easily corrected, Knussman refused "to pursue this option any further." J.A. 828.

Mullineaux denied Knussman's request for paid sick leave under § 7-508(a) as a primary care giver. Knussman returned to work as ordered and immediately filed an administrative grievance on the grounds that he had been improperly denied primary care giver status under § 7-508(a). He did not seek review of Mullineaux's denial of his request for family sick leave under section 7-502(b)(2). Once the grievance process was underway, Knussman's claim went up the MSP chain-of-command and Mullineaux's involvement ceased.

Knussman's grievance was denied at each stage of the four-level grievance procedure. By the time Knussman reached step two, which consisted of a review conference held by Knussman's Assistant Commanding Officer Czorapinski, the MSP apparently had retreated from Mullineaux's earlier, categorical classification of mothers as primary care givers and fathers as secondary providers. Czorapinski testified that prior to the grievance conference, he notified Knussman that the DOP had "recanted [its] policy [that] mother's primary, father's secondary," J.A. 840, and that Knussman was indeed eligible for primary care giver status and could qualify by providing "some information on why you are the primary caregiver." J.A. 841. And, Knussman acknowledged that Czorapinski explained that he would be trying to determine during the step two grievance conference whether Knussman was the primary care giver. Also, Czorapinski's later written ruling explained that "the overall issue of primary v. secondary was still a matter to be resolved in [Knussman's] case" and that Knussman was told to "be prepared to establish himself as primary care giver at the conference." J.A. 1208. Thus, Czorapinski, interpreting the statute to permit only one primary care giver, offered Knussman the opportunity to demonstrate that he was that person.

After a formal conference with Knussman and his lawyer, Czorapinski denied Knussman's grievance, reasoning that Knussman failed to present enough evidence to support his claim of primary status:

The grievance filed by Tfc. Knussman states that Mrs. Knussman had medical complications during and after pregnancy that necessitated him to assume primary child care responsibilities. [The documents] presented to verify this necessity fail to make any argument in that regard....

All indications are that Mrs. Knussman was capable of providing for the care and nurturing of their child after birth. She was off on maternity leave from December 9, 1994 when the child was born until January 23, 1995 when she was certified fit for full time work, a period equivalent to the 30 days allowed by the statute involved in this matter. Additionally, there was nothing offered to indicate that she was unwilling or otherwise unable to provide care for the child. Basically speaking, she was receiving all of the benefits afforded by statute.

Taking into consideration all of these facts, Mrs. Knussman has to be identified as the primary care giver in this instance. Tfc. Knussman has not shown any difference between himself and Mrs. Knussman in skill, talent or ability in providing care and nurturing for the child. Since Mrs. Knussman was already receiving benefits equal to those specified for primary care givers according to statute, there is no

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

reason to **\*631** extend similar primary care benefits[to] Tfc. Knussman. He was afforded benefits of [a] secondary care provider as he was rightfully entitled. While Tfc. Knussman may have desired the designation as primary, he has failed to justify that claim.

J.A. 1209-10. Essentially, Czorapinski believed that Kimberly Knussman, who was also a state employee, was enjoying the benefits of nurturing leave as a primary care giver because, following delivery, she took sick leave for a 30-day period--the same amount of time afforded a primary care giver under § 7-508(a). Thus, Czorapinski was concerned that both Knussmans were attempting to qualify as the primary care giver for their daughter when the statute indicated only one person could qualify. At trial, Knussman presented evidence that, prior to the step two grievance conference, Mullineaux and Czorapinski were made aware of the fact the Kimberly Knussman was, in fact, on sick leave for her own disability resulting from the difficult pregnancy. Following Czorapinski's decision, Knussman pursued his complaint through the two remaining steps of the internal grievance procedure without success.

Knussman then filed a three-count action in federal court. In Count I, Knussman sought relief under § 1983, claiming that his leave request under § 7-508(a) was denied as a result of gender discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. In Count II, Knussman asserted that the denial of his request for additional paid leave violated the FMLA. See 29 U.S.C.A. § 2612(d)(2)(A) ("An eligible employee may elect ... to substitute any of the accrued paid ... personal leave, or family leave of the employee for leave provided under [the FMLA] for any part of the 12-week period of such leave...."). Knussman brought Count II directly under the FMLA as well as under § 1983. Third, Knussman asserted a claim under the Maryland Equal Rights Amendment but subsequently agreed to dismiss it. He named as defendants the State of Maryland, the MSP, and several employees of the MSP, in both their individual and official capacities: Mullineaux, Czorapinski, Creel, and Colonel David B. Mitchell, Superintendent of the MSP.

Initially, the defendants moved to dismiss Counts I and II on the grounds that the Eleventh Amendment afforded immunity from suit to the State of Maryland, the MSP, and the individual defendants in their official capacities. The district court dismissed Knussman's § 1983 equal protection claim under Count I as to the State of Maryland, the MSP, and the individual defendants in their official capacities to the extent the claims sought money damages. See *Knussman v. State*

*of Maryland,* 935 F.Supp. 659, 663-64 (D.Md.1996). The district court denied the motion to dismiss with respect to Knussman's claims under Count II that the defendants violated the FMLA. See id. at 664.

After a period of discovery, the defendants moved for summary judgment on the grounds that they were entitled to qualified immunity and that Knussman could not prove an equal protection violation in the first place. With respect to Knussman's equal protection claim under § 1983 (Count I), the court concluded that the facts, viewed in the light most favorable to Knussman, indicated that the defendants applied a gender-based presumption that the birth mother was the primary care giver, which would amount to an equal protection violation. See *Knussman v. State of Maryland,* 16 F.Supp.2d 601, 611-12 (D.Md.1998) ("*Knussman II*"). The district court further concluded that the defendants were not entitled to qualified immunity because it was well- established at the time that gender discrimination **\*632** in employment was prohibited under the Fourteenth Amendment:

> Although the Maryland leave law had been amended effective less than one month before [Knussman] requested leave and the DOP had not issued any guidelines regarding application of the amended law, the right to equal protection is a well-established principle. It is also clear that gender discrimination violates the equal protection clause. Discriminatory application of a gender neutral state law is patently illegal and defendants should have known at least this much.

*Id.* at 612. As for the FMLA claims (Count II), however, the district court granted qualified immunity to all of the individual defendants in their individual capacities. See id. at 611.

Thus, the case went to trial on portions of both counts in the complaint. As for Count I, Knussman's § 1983 equal protection claim remained intact against the State of Maryland (but only for declaratory and injunctive relief) and the defendants in their individual capacities. At the close of the evidence, the court submitted the question of qualified immunity to the jury as well as the ultimate question of liability. The jury concluded that each defendant denied Knussman's request for leave because of his gender; however, the jury also found that every defendant except Mullineaux was entitled to qualified immunity. Knussman does not challenge this conclusion on appeal. On Count II, the FMLA claim brought under both the FMLA and § 1983 against the State of Maryland and the defendants in their official capacities, the jury concluded that all of the defendants denied Knussman leave to which he was entitled under the FMLA. The jury awarded Knussman the sum of $375,000 in damages.

The defendants moved for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, or, alternatively, for a new trial under Rule 59(a). *See* *Knussman v. State of Maryland,* 65 F.Supp.2d 353, 354 (D.Md.1999) ("*Knussman III* "). The district court rejected Mullineaux's renewed argument that she was entitled to qualified immunity:

The Court finds no reason to disturb the jury's findings in this regard. A jury could have reasonably concluded from the evidence that Mullineaux, as the personnel officer in the State's Personnel Management Division, should have recognized that she was applying a gender neutral leave statute in a discriminatory manner by making only men prove they are primary care givers to a newborn or adopted child.

*Knussman III,* 65 F.Supp.2d at 360.

The defendants also raised various challenges to the damages awarded by the jury on Count II, the FMLA claim. Ultimately, the district court vacated the jury's verdict on Count II and "amend[ed] the judgment to remove the State and the individual defendants in their official capacities from liability for money damages." *Id. at 360.* Thus, Mullineaux became the only defendant subject to monetary liability. She argued that the $375,000 award of damages was excessive. The district court rejected this argument, concluding there was sufficient evidence for the jury to conclude that Knussman suffered significant emotional damage. *See id.*

On appeal, Mullineaux contends that she was entitled to qualified immunity on Knussman's equal protection claim under § 1983. She also challenges, on multiple grounds, the jury's verdict as well as the court's jury instructions. [FN6]

FN6. We need not address whether the Eleventh Amendment permits Knussman to bring an FMLA claim against the States and the defendants in their official capacities. The district court vacated the jury's verdict on Count II and Knussman has not appealed that decision. In light of our disposition of this appeal, there is no need to determine whether the submission of the FMLA claim to the jury tainted the verdict, and hence no need to examine the viability of Knussman's FMLA claim.

**\*633** II.

[1] First, we turn to defendant Mullineaux's argument

that she was entitled to qualified immunity from Knussman's claims. Public officials "are protected by qualified immunity when performing their duties within the scope of their employment insofar as their conduct does not breach 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Sigman v. Town of Chapel Hill,* 161 F.3d 782, 786 (4th Cir.1998) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "The reasonableness inquiry is an objective one, measured by reference to clearly established law." *Milstead v. Kibler,* 243 F.3d 157, 161 (4th Cir.2001) (internal quotation marks omitted). Essentially, officials

performing a discretionary function enjoy an immunity that shields them from liability for civil damages unless (1) the officers' conduct violates a federal statutory or constitutional right, and (2) the right was clearly established at the time of the conduct, such that (3) an objectively reasonable officer would have understood that the conduct violated that right.

*Id.; see* *Anderson v. Creighton,* 483 U.S. 635, 638-40, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

*Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), instructs that "[a] court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.' " *Id.* at 609, 119 S.Ct. 1692 (emphasis added) (quoting *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999)); *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). "Were courts to rule on qualified immunity without determining the constitutionality of the challenged conduct, 'standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals. An immunity determination, with nothing more, provides no clear standard, constitutional or non- constitutional.' " *Kibler,* 243 F.3d at 162 (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)).

The initial question, therefore, is whether a violation of a constitutional right has been demonstrated. *See* *Wilson,* 526 U.S. at 609, 119 S.Ct. 1692. "If so, we may proceed to determine whether [the official] is entitled to qualified immunity or whether, because he ran afoul of clearly established constitutional rights, he is to be held personally accountable for his unlawful conduct." *Doe v. Broderick,* 225 F.3d 440, 446 (4th Cir.2000).

Mullineaux moved for qualified immunity at the summary judgment stage under Rule 56 of the Federal Rules of Civil Procedure. The district court denied the motion. See *Knussman II*, 16 F.Supp.2d at 612. The case proceeded to trial and the district court submitted the question of qualified immunity to the jury. With regard to the question of whether Knussman established a constitutional violation, the court instructed the jury that "[t]he government and its officials may employ a sex-based classification or policy only if they can demonstrate an exceedingly persuasive **634** justification for the policy and can show that the discriminatory classification is substantially related to the achievement of governmental objectives." J.A. 1091-92. The jury was further instructed that "[w]here a law is gender neutral on its face, discriminatory application of that law is unconstitutional." J.A. 1092. The district court then explained that even if the jury were to conclude that the defendants discriminated based on gender, the defendants could escape liability if they were entitled to qualified immunity, *i.e.,* "if at the time [they] discriminated based on gender [they] neither knew nor should have known that [their] actions were contrary to federal law." J.A. 1092. The jury was told that at the time in question, it was clearly established federal law that "gender discrimination violates the equal protection clause." J.A. 1092. The jury concluded that all of the individual defendants except Mullineaux were entitled to qualified immunity.

 [2] Mullineaux renewed her motion at the post-verdict stage under Rule 50(b). The district judge, in reviewing the Rule 50(b) motion, refused to disturb the jury's determination that Mullineaux was not entitled to qualified immunity. See *Knussman III*, 65 F.Supp.2d at 360-61. Ultimately, it is this decision that we are reviewing. On appeal, we consider the district court's ruling on the Rule 50(b) motion in light of the full trial record rather than the court's denial of summary judgment under Rule 56(c) on less than a full record. See *Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.,* 51 F.3d 1229, 1236-37 (4th Cir.1995). Our review of the district court's denial of Mullineaux's Rule 50(b) motion is *de novo,* and we view the evidence in the light most favorable to Knussman. See *Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727 (4th Cir.1999).

 [3] Before turning to our analysis of whether Mullineaux is entitled to qualified immunity, we pause to note that, although the jury may be suited for making factual findings relevant to the question of qualified immunity, we believe it is far better for the court, not the jury, to answer the ultimate legal question of whether a defendant is entitled to qualified immunity. See *Warren v. Dwyer,* 906 F.2d 70, 76 (2nd Cir.1990)

("The ultimate legal determination whether, on the facts found, a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide."). The nature of the analysis--requiring an examination of current federal law and federal law as it existed at the time of the alleged violation--makes for an awkward determination by the jury, at best. But, since the issue has not been raised, we will leave for another day the question of whether it is ever appropriate for a jury to answer the ultimate legal question of a defendant's entitlement to qualified immunity.

A.

 [4] We first consider the issue of whether the evidence adduced at trial is sufficient to establish that Mullineaux committed a constitutional violation under the law as it currently stands. In a nutshell, Knussman's contention is that Mullineaux applied a facially neutral statute unequally solely on the basis of a gender stereotype in violation of the Equal Protection Clause of the Fourteenth Amendment. The only distinction created by the statute was between "primary care givers" and "secondary care givers," the former being entitled to 30 days of accrued sick leave to care for a newborn and the latter being entitled to 10 days of accrued sick leave. See Md.Code Ann., *State Pers. & Pens.* § 7-508. The statute made no reference to gender. Rather, the gender classification was created in the application of § 7-508. Viewed **635** in the light most favorable to Knussman, Mullineaux, based on the comments of an administrative assistant to the DOP's Director of Legislation, took the position that only mothers could qualify for additional paid leave as primary care givers under § 7-508(a). Essentially, Mullineaux applied an irrebutable presumption that the mother is the primary care giver, and therefore entitled to greater employment benefits. [FN7]

> FN7. The fact that Mullineaux told Knussman that he would be eligible for primary care giver status if his wife were "in a coma or dead" is of no moment. That was the same as telling Knussman he could never qualify. If Knussman is given the benefit of the doubt, the evidence establishes that Mullineaux categorically denied fathers eligibility for primary care giver status. Thus, it is unnecessary for us to decide whether Mullineaux could have constitutionally applied a truly rebuttable presumption in favor of the mother.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

[5] We agree with Knussman that Mullineaux's conduct violated his rights under the Equal Protection Clause. Government classifications drawn on the basis of gender have been viewed with suspicion for three decades, beginning with the Supreme Court's decision in *Reed v. Reed,* 404 U.S. 71, 77, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), in which the Court condemned "dissimilar treatment for men and women who are ... similarly situated."    As its equal protection jurisprudence developed in subsequent cases, the Court did not view gender classifications as "benign":

> [S]ince sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth, the imposition of special disabilities upon the members of a particular sex because of their sex would seem to violate "the basic concept of our system that legal burdens should bear some relationship to individual responsibility...." And what differentiates sex from such nonsuspect [classifications] as intelligence or physical disability ... is that the sex characteristics frequently bears no relation to ability to perform or contribute to society.

*Frontiero v. Richardson,* 411 U.S. 677, 686, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (first ellipsis in original) (citation omitted); *see United States v. Virginia,* 518 U.S. 515, 532, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) ( "*VMI* ") ("Since *Reed,* the Court has repeatedly recognized that neither federal nor state government acts compatibly with the equal protection principle when a law or official policy denies to women, simply because they are women, full citizenship stature...."). Thus, a gender classification is subject to heightened scrutiny and will fail unless it "serve[s] important governmental objectives and [is] substantially related to achievement of those objectives." *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *see Wengler v. Druggists Mut. Ins. Co.,* 446 U.S. 142, 150, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980); *see also Mitchell v. Commissioner of the Social Security Administration,* 182 F.3d 272, 274 (4th Cir.) ("[C]ertain quasi- suspect classifications, such as gender and illegitimacy, are subject to an intermediate form of scrutiny and will be upheld if 'substantially related to a sufficiently important governmental interest.' ") (quoting *City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 441, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1996)), *cert. denied,* 528 U.S. 944, 120 S.Ct. 358, 145 L.Ed.2d 280 (1999).

[6]  In particular, justifications for gender-based distinctions that are rooted in "overbroad generalizations about the different talents, capacities, or preferences of males and females" will not suffice. *VMI,* 518 U.S. at 533, 116 S.Ct. 2264. "Legislative classifications which distribute benefits and burdens on the basis of gender **636** carry the inherent risk of reinforcing stereotypes about the 'proper place' of women and their need for special protection." *Orr v. Orr,* 440 U.S. 268, 283, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979).  Thus, gender classifications that appear to rest on nothing more than conventional notions about the proper station in society for males and females have been declared invalid time and again by the Supreme Court.  For example, in *Frontiero,* the Supreme Court invalidated a federal statute that permitted a male member of the uniformed services automatically to claim his wife, for purposes of obtaining additional benefits, as a dependent, but precluded a female member from so claiming her husband unless she could demonstrate that he was, in fact, dependent upon her for more than half of his support.  *See* 411 U.S. at 678-79, 93 S.Ct. 1764.  The Court concluded that the purported reason for the different treatment of males and females, administrative convenience, was premised on the impermissibly broad assumption that wives are dependent upon their husbands for support.  *See id.* at 689, 93 S.Ct. 1764 (rejecting the Government's argument "that Congress might reasonably have concluded that it would be both cheaper and easier simply conclusively to presume that wives of male members are financially dependent upon their husbands").  In *Wengler,* the Supreme Court struck down a Missouri workers' compensation provision that automatically paid death benefits to a widow but required a widower to demonstrate that he was actually dependent on his wife's earnings or that he was mentally or physically incapacitated. The *Wengler* Court again rejected the stereotypical justification offered for treating males and females differently--"that most women are dependent on male wage earners and that it is more efficient to presume dependency in the case of w o m e n   t h a n   t o   e n g a g e   i n   c a s e - t o - c a s e determination[s]."  446 U.S. at 151, 100 S.Ct. 1540.  And, in *Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975), the Supreme Court invalidated a provision of the Social Security Act that paid benefits to a widow and her minor children based on her deceased husband's earnings but, in the case of a deceased wife, provided benefits only to the minor children and not the widower.  *See id.* at 637-39, 95 S.Ct. 1225.  The section of the Social Security Act at issue there was premised upon "the notion that men are more likely than women to be the primary supporters of their spouses and children."  *Id.* at 645, 95 S.Ct. 1225; *see also Califano v. Goldfarb,* 430 U.S. 199, 201-02, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977) (invalidating Social Security provision requiring a widower, but not a widow, to prove dependency); *Orr,* 440 U.S. at 280-83, 99 S.Ct. 1102 (holding unconstitutional an Alabama statute making alimony available to wives only).

Gender classifications based upon generalizations about typical gender roles in the raising and nurturing of children have met a similar fate. In *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Court determined that an Illinois statute was infirm under equal protection principles where unmarried fathers were presumed to be unfit to raise their children but married mothers (as well as married fathers) were presumed fit, meaning that "the children of unwed fathers [became] wards of the State upon the death of the mother." *Id.* at 646, 92 S.Ct. 1208. The Court determined that "all Illinois parents are constitutionally entitled to a hearing on their fitness before their children are removed from their custody" and that denying a hearing to unwed fathers while granting it to unwed mothers (and married fathers) "is inescapably contrary to the Equal Protection Clause." *Id.* at 658, 92 S.Ct. 1208; *see also* *Weinberger,* 420 U.S. at 652, 95 S.Ct. 1225 (observing that "a father, no less than a mother, has a **637** constitutionally protected right to the companionship, care, custody, and management of the children" (internal quotation marks omitted)).

In *Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), the Court specifically rejected the argument that a state can classify based solely upon the idea that the maternal child-raising role is necessarily primary. There, a New York law gave unwed mothers the power to block the adoption of their children, in the majority of cases, by withholding consent; unwed fathers--even those with a substantial relationship with their children-- did not enjoy the same power. Thus, the statute in *Caban* treated unmarried parents differently based on their gender. In holding that the statute did not bear a substantial relation to an important governmental interest, the Court rejected the argument that "the distinction is justified by a fundamental difference between maternal and paternal relations--that 'a natural mother, absent special circumstances, bears a closer relationship with her child ... than a father does.' " *Id.* at 388, 99 S.Ct. 1760 (ellipsis in original). The *Caban* Court observed that "[c]ontrary to appellees' argument and to the apparent presumption underlying [the New York statute], maternal and paternal roles are not invariably different in importance" and thus "reject[ed] ... the claim that the broad, gender-based distinction of [the statute] is required by any universal difference between maternal and paternal relations at every phase of a child's development." *Id.* at 389, 99 S.Ct. 1760.

The defendants have not even attempted to explain how an irrebuttable presumption in favor of the mother under § 7-508 relates to an important state interest. We conclude that the presumption employed by Mullineaux here was not substantially related to an important governmental interest and, therefore, was not permissible under the Equal Protection Clause. [FN8]

FN8. We agree with the concurring opinion to the extent that it highlights the general proposition that the discriminatory application of a statute that is neutral on its face violates the Equal Protection Clause. *See* *Sylvia Dev. Corp. v. Calvert County, Md.,* 48 F.3d 810, 818-19 (4th Cir.1995). Respectfully, however, we doubt that we have mischaracterized the nature of the constitutional right at issue by not focusing on the distinction between a gender classification created by legislative enactment and one created by the actions of a single state official. *See* *O'Bar v. Pinion,* 953 F.2d 74, 81 (4th Cir.1991) ("When we conduct an equal protection review of the individualized decision of a state official made within his lawful authority, we apply the same analysis as is commonly used in the context of allegedly unlawful legislative decisions.").

B.

We next must decide whether Mullineaux's actions contravened "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "Clearly established for purposes of qualified immunity means that the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wilson,* 526 U.S. at 614-15, 119 S.Ct. 1692 (alterations and internal quotation marks omitted). Although it is not required that the exact action at issue has been previously determined to be unlawful, "in the light of pre-existing law the unlawfulness must be apparent." *Id.* at 615, 119 S.Ct. 1692 (internal quotation marks omitted); *Saucier,* 121 S.Ct. at 2156. *Wilson* reiterated that "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Id.* Therefore, **638** our analysis of whether the constitutional right at issue was clearly established must proceed "at a high level of particularity." *Edwards v. City of Goldsboro,* 178 F.3d 231, 250- 51 (4th Cir.1999). [FN9]

FN9. Here, the concurring opinion departs and would, like the district court, define the right

in fairly broad terms: whether "a person's right not to have a gender neutral statute applied in a discriminatory manner" was clearly established in 1994. Such a broad definition is not faithful to the particularity principle which "mandates that courts refer to concrete applications of abstract concepts to determine whether the right is clearly established." *Amaechi v. West,* 237 F.3d 356, 362 (4th Cir.2001). In our view, defining the right so broadly is not too far removed from framing the issue as whether it was clearly established that a person had the right not to be discriminated against based on gender. Such a definition is too general to provide state officials with adequate guidance on the constitutional limits to their conduct. *Cf. Wilson,* 526 U.S. at 615, 119 S.Ct. 1692 (rejecting the notion that "any violation of the Fourth Amendment [by an officer] is 'clearly established,' since it is clearly established that the protections of the Fourth Amendment apply to the actions of the police.").

[7] We view the relevant constitutional question as follows: was the law clearly established in December 1994 that the equal protection clause prohibited a state agency from permitting only mothers, never fathers, to take child-nurturing leave benefits available to the primary care giver for a newborn? We think the decisions outlined above demonstrate that it was.

Mullineaux contends that the law was not clear because the Supreme Court had determined on a number of occasions that equal protection principles permit government officials to distribute employment-related benefits pursuant to gender-based classifications. In the decisions cited by Mullineaux, however, the gender-based classification was linked to something other than a sexual stereotype. For example, Mullineaux relies on *Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974). In our view, *Geduldig* does not cloud the issue. In *Geduldig,* the Court upheld a California insurance statute that excluded pregnancy-related disabilities from coverage against an equal protection challenge, observing that the exclusion of disabilities relating to normal childbirth (as well as other short-term disabilities not related to pregnancy) represented a permissible policy choice aimed at maintaining the solvency of the insurance program. *See id.* at 494-97, 94 S.Ct. 2485. *Geduldig* distinguished the *Frontiero* line of decisions:

The California insurance program does not exclude anyone from benefit eligibility because of gender but merely removes one physical condition--

pregnancy--from the list of compensable disabilities. While it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification like those considered in *Reed* ... and *Frontiero* .... Normal pregnancy is an objectively identifiable physical condition with unique characteristics. Absent a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other, lawmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation such as this on any reasonable basis, just as with respect to any other physical condition.

*Id.* at 496 n. 20, 94 S.Ct. 2485. Likewise, Mullineaux's reliance on decisions such as *Califano v. Webster,* 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977) (per curiam), is unavailing. In *Webster,* the Court approved a provision of the Social Security Act that afforded women a more favorable **639 method of calculating "old-age insurance benefits" than for similarly situated males, *see id.* at 314-16, 97 S.Ct. 1192, because Congress aimed the statute at reducing "the disparity in economic condition between men and women caused by the long history of discrimination," *id.* at 317, 97 S.Ct. 1192. Thus, the statute's disparate treatment of men and women "was not the accidental byproduct of a traditional way of thinking about females." *Id.* at 320, 97 S.Ct. 1192 (internal quotation marks omitted).

The authority cited by Mullineaux actually underscores our conclusion regarding the clarity of the law in December 1994. Mullineaux's distribution of sick leave benefits under § 7-508 was a by-product of traditional ideas about a woman's role in rearing a child, which was clearly impermissible under the Equal Protection Clause of the Fourteenth Amendment at the time in question.

Accordingly, we affirm the denial of qualified immunity to Mullineaux and the jury's verdict with respect to liability. Given our finding in this regard, we need not consider the effect of the overly broad definition of the constitutional right contained in the jury instructions.

III.

[8][9] Mullineaux seeks a new trial on damages, raising several challenges to the jury's award of $375,000. Mullineaux's principal argument is that the verdict was excessive and that the district court erred in refusing to grant a new trial on this basis. *See Knussman III,* 65 F.Supp.2d at 360. We review a district court's denial

of a Rule 59 motion for a new trial for abuse of discretion. *See Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir.1998).* On a Rule 59 motion, the district court must

> set aside the verdict and grant a new trial[ ] if ... (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.

*Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.,* 99 F.3d 587, 594 (4th Cir.1996) (quoting *Aetna Casualty & Sur. Co. v. Yeatts,* 122 F.2d 350, 352-53 (4th Cir.1941)). On an excessiveness challenge, we review a jury's determination of the amount of compensatory damages under the first two prongs of the Rule 59 standard: " 'whether the jury's verdict is against the weight of the evidence or based on evidence which is false.' " *Cline,* 144 F.3d at 305 (quoting *Atlas Food,* 99 F.3d at 594).

[10][11] Knussman sought damages solely for emotional distress that he claimed to have suffered because of Mullineaux's actions. He did not suffer any direct pecuniary harms such as loss of income. Compensatory damages for emotional injuries are recoverable under § 1983. *See Memphis Cmty. Sch. Dist. v. Stachura,* 477 U.S. 299, 307, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) ( "[C]ompensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation ..., personal humiliation, and mental anguish and suffering." (internal quotation marks omitted) (ellipsis in original)); *Carey v. Piphus,* 435 U.S. 247, 263- 64, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Damages under § 1983 are intended to compensate for actual injuries caused by constitutional violations; therefore, a § 1983 plaintiff alleging emotional distress must demonstrate that the emotional duress resulted from the constitutional violation itself. *See Carey,* 435 U.S. at 263, 98 S.Ct. 1042. The plaintiff must adduce sufficient evidence "that such distress did in fact **\*640** occur and that its cause was the constitutional deprivation itself and cannot be attributable to other causes." *Price v. City of Charlotte, North Carolina,* 93 F.3d 1241, 1250 (4th Cir.1996); *see Hetzel v. County of Prince William,* 89 F.3d 169, 171-72 (4th Cir.1996) (concluding compensatory damages award on a retaliation claim under § 1983 was excessive because "only a part of Hetzel's harms [were] properly attributed to appellants' retaliatory actions. *Much, if not all, of Hetzel's claimed distress was actually caused by her erroneous belief that she was the victim of invidious discrimination,* and of course, given the jury's findings for the defendants on all of Hetzel's claims of discrimination, Hetzel is entitled to no damages for any

injuries which were caused by her belief that she was [discriminated against]" (emphasis in original)). A plaintiff seeking compensatory damages for emotional injuries cannot rely on "conclusory statements that the plaintiff suffered emotional distress [or] the mere fact that a constitutional violation occurred," but, rather, "the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated." *Price,* 93 F.3d at 1254.

[12] In determining whether an award of damages for emotional distress for a constitutional deprivation is excessive, an appellate court may look to a number of factors: medical attention resulting from the emotional duress; psychiatric or psychological treatment; the degree of such mental distress; the factual context in which the emotional distress developed; evidence corroborating the testimony of the plaintiff; the nexus between the conduct of the defendant and the emotional distress; mitigating circumstances, if any; physical injuries suffered as a result of emotional distress; and loss of income, if any. *See id.* A substantial award of compensatory damages like Knussman's "must be proportional to the actual injury incurred" and "must focus on the real injury sustained." *Hetzel,* 89 F.3d at 173 (internal quotation marks omitted).

[13] Knussman presented sufficient evidence for the jury to conclude that the emotional distress and mental anxiety he experienced was a genuine injury resulting, at least to some extent, from Mullineaux's equal protection violation. Knussman testified that he was "particularly disgusted" with Mullineaux's comments that Knussman could not qualify for primary care giver status because he could not breast feed and that Kimberly Knussman would have to die or slip into a coma for him to become eligible. He indicated that in March 1995--approximately one month before Knussman initiated this lawsuit--he began experiencing anxiety and losing sleep as a result of "the comments by Miss Mullineaux" as well as the commencement of the internal grievance process. J.A. 196. According to Knussman, by the fall of 1996, his anxiety had begun to manifest itself as "chest pain" and "palpitations," and he decided to seek professional help. He was eventually prescribed medication to manage his symptoms of depression. Moreover, Knussman presented medical evidence to corroborate his testimony that he was experiencing emotional distress. Dr. Susan Toler, a clinical psychologist who treated Knussman, testified that by 1996, Knussman was frequently experiencing "panic attack[s]," J.A. 548, which Dr. Toler attributed to Knussman's "dispute with his employer over leave." J.A. 550. Dr. Toler diagnosed Knussman with "major depressive disorder," J.A. 560, and occupation-related "adjustment disorder," J.A. 561. Dr. Lydia Wenz, a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

treating psychiatrist, concurred in the diagnosis of major depressive disorder. Thus, Knussman was entitled to recover some amount of compensatory damages for emotional distress.

**\*641** [14] The nexus, however, between Mullineaux's unconstitutional conduct and Knussman's emotional injuries is attenuated, and this is a factor for us to consider in assessing whether Knussman's award for emotional distress is excessive. *See Price,* 93 F.3d at 1254. [FN10] Mullineaux abridged Knussman's constitutional rights by denying him the same opportunity to qualify for primary care giver status as would be afforded a mother. Mullineaux's role, however, was limited to the initial denial of Knussman's request for primary care giver status under § 7-508. Once the internal grievance process was underway, Mullineaux's involvement ceased.

> FN10. In reviewing whether the award is excessive, we consider factors that are neither new nor amorphous. Rather, our court listed these general factors in *Price. See* 93 F.3d at 1254. The strength of the nexus between the defendant's conduct and the emotional distress suffered is one of the factors to consider--we have not created any new standard. Nor have we suggested that "uncontroverted medical testimony" is legally insufficient to establish causation; indeed, if the evidence was not sufficient to establish causation, then the question would be whether Knussman is entitled to any damages at all. Here, we are only concerned with how much.

Furthermore, the evidence linked a large portion of Knussman's emotional difficulties to the litigation of this action and, to some extent, the general MSP "grievance process" rather than Mullineaux's unconstitutional conduct. Dr. Toler explained that Knussman began experiencing physical symptoms related to anxiety as a result of the "tensions that were building between himself and his employer over ... this request for child leave, and then that he had appealed the decision, and ... there was a series of administrative procedures that he became involved with and around appeals or grievances or whatever." J.A. 550. Dr. Toler opined that following the original leave denial, Knussman began feeling anxiety and stress that increased at every stage of the internal grievance procedure and the litigation process. The litigation of Knussman's claims "magnified the conflicts with the employer, and ... directly impacted his sleep," J.A. 558, and intensified "the adversarial relationship that had

evolved and developed over the course of the years," J.A. 571. Dr. Toler acknowledged that Knussman's symptoms of anxiety "elevate[d] during periods of more activity in the litigation" and "dissipated during periods of low activity in the litigation." J.A. 588. According to Dr. Toler, Knussman's depressive symptoms--his sleeplessness, inability to concentrate and lack of zest for life--were not alleviated when he was granted leave for the birth of his second child "because, by that time, the litigation was well under way and there were a lot of activities around the first grievance and complaint that continued to wear on him." J.A. 580. And, Dr. Toler's treatment plan included a recommendation that Knussman resolve the litigation. Dr. Wenz recommended a similar course. [FN11]

> FN11. Dr. Wenz's notes indicated that, in addition to psychotherapy and medication, she had "discussed with Mr. Knussman that as he is involved in legal transactions, that until these are resolved, symptoms may persist to some degree. I have encouraged him to discuss this with his legal counsel and pursue rapid resolution." J.A. 1203.

[15] Indeed, any anxiety, stress or other unpleasantness that Knussman experienced as a by-product of litigation or the grievance process was not caused by "the constitutional deprivation itself." *Price,* 93 F.3d at 1250. Such mental distress is "inherent in most litigation" and although "[i]t can be argued that [Knussman] should not have been placed in a position where [he] had to assert[his] rights, ... the same can be said of the successful plaintiff in *any* case." **\*642** *School Dist. No. 1, Multnomah County v. Nilsen,* 271 Or. 461, 534 P.2d 1135, 1146 (1975) (emphasis added). Generally speaking, litigation-induced emotional distress is never a compensable element of damages. *See, e.g., Stoleson v. United States,* 708 F.2d 1217, 1223 (7th Cir.1983) ("It would be strange if stress induced by litigation could be attributed in law to the tortfeasor. An alleged tortfeasor should have the right to defend himself in court without thereby multiplying his damages...."); *Blakey v. Continental Airlines, Inc.,* 992 F.Supp. 731, 736 n. 3 (D.N.J.1998); *Picogna v. Board of Educ.,* 143 N.J. 391, 671 A.2d 1035, 1038-39 (1996) (collecting cases).

Clearly, Knussman's anxiety and emotional distress in large measure were associated with the litigation of this action or the general grievance process as opposed to the specific constitutional violation at issue. Apart from this litigation-related stress, Knussman's evidence of emotional distress is insufficient to support an award

of $375,000. Although Knussman unquestionably suffered real emotional problems, it is clear that much of his genuine emotional distress resulted from or was exacerbated by the litigation process. We conclude the award of $375,000 is not proportional to the emotional distress caused by the constitutional violation, as opposed to the litigation of Knussman's claims, and is clearly against the weight of the evidence. Because it is not possible to determine what portion of the verdict was intended to compensate Knussman for the emotional damages attendant only to the litigation process, a new trial on damages is more appropriate than a new trial nisi remittitur. *See Cline,* 144 F.3d at 305 ("[W]e have the option of ordering a new trial nisi remittitur."). [FN12]

> FN12. In light of our conclusion that the jury's verdict was excessive, we need not address Mullineaux's argument that the general verdict rendered by the jury had to be vacated because there was no way to determine what portion of the $375,000 was intended to compensate Knussman on his FMLA claim under Count II, which was subsequently vacated by the district court. Given that Knussman has not appealed the district court's post-trial rulings, the FMLA claim will not be part of the remand proceedings. Thus, any issue involving the effect of the FMLA claims is moot.

### IV.

In sum, we hold that Mullineaux was not entitled to qualified immunity against Knussman's equal protection claim under § 1983 and affirm the judgment as to liability, but we conclude that the jury's award of $375,000 was excessive. Accordingly, we vacate the jury's award and remand for a new trial on damages with respect to Knussman's equal protection claim (Count I). Knussman is entitled to be compensated for emotional distress caused by Mullineaux's constitutional violation but not for any emotional distress associated with the litigation of this action or his employer's general internal grievance process. [FN13]

> FN13. Mullineaux also argues that the district court erred in refusing to instruct the jury under *Price v. City of Charlotte* that before the jury was permitted to award emotional distress damages for Mullineaux's denial of leave under § 7-508(a), it was required to find specifically that Knussman was entitled to

such leave in the first place. *See Price,* 93 F.3d at 1256. We address this argument to keep it from becoming an issue on remand. Assuming the district court erred in failing to instruct the jury under *Price* (and Mullineaux has not provided the specific instruction that she believes was required), any error was harmless. The evidence at trial was that Knussman, in fact, performed most if not all of the traditional care functions for his infant daughter and that his wife was home on leave following the delivery *as a result of her own disability.* Mullineaux has failed to direct us to any substantial evidence to the contrary. Accordingly, the jury could only have concluded that Knussman was entitled to leave under § 7-508(a) as a primary care giver.

**\*643** *AFFIRMED IN PART, VACATED IN PART, AND REMANDED.*

LEE, District Judge, concurring in part and dissenting in part:

Two issues are before the Court. First, whether a reasonable personnel official in Mullineaux's position and with her experience would have known in 1994 that it was unlawful to apply a gender neutral child nurturing leave law in a discriminatory manner by basing a decision with respect to employment benefits on gender stereo-types. Second, whether the trial court abused its discretion in finding that the clear weight of the evidence supported the jury's verdict of $375,000 for Trooper Knussman's emotional distress and time lost with his newborn daughter.

The Majority concludes that Mullineaux was not entitled to qualified immunity on the grounds that her interpretation of the state policy on nurturing leave was a by-product of gender stereotypes about a woman's role in child rearing. I agree with the Majority's conclusion that Mullineaux is not entitled to qualified immunity; however, I write separately to stress the fact that Mullineaux is not entitled to qualified immunity because she engaged in the discriminatory application of a gender neutral statute. The Majority concludes further that the district court abused its discretion in upholding the $375,000 jury verdict because the Majority's review of the record revealed that the nexus between the constitutional injury and the evidence presented on damages was "attenuated at best." I dissent from this portion of the Majority's Opinion

because in reaching its conclusion the Majority creates a new standard of review for causation and a jury award that is amorphous and impossible to maintain. The district court did not abuse its discretion in finding that the weight of the evidence submitted supported the $375,000 verdict. Accordingly, I would affirm the district court's decision in its entirety.

I.

Mullineaux is not entitled to qualified immunity because a reasonable personnel official in Mullineaux's position, and with her experience, would have known in 1994 that the law is clearly established that it is unlawful to administer a gender neutral leave law in a discriminatory manner and to base her decision with respect to employment benefits on an employee's gender. Appellate review of a trial court's decision that a party is not entitled to qualified immunity is a matter of law and is subject to de novo review. *See, e.g., Winfield v. Bass, 106 F.3d 525, 529 (4th Cir.1997).* As the Majority clearly states, the Supreme Court formulated a two-prong test to determine whether qualified immunity shields a public official from civil liability. *See Harlow v. Fitzgerald, 457 U.S. 800, 818-19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).* Under the first prong, the court must identify the constitutional right at issue and determine whether that right was clearly established at the time of the alleged infringement. *See Wilson v. Layne, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).* Under the second prong, the court must determine whether a reasonable officer would have known he violated such right. *See Wilson, 526 U.S. at 614-15, 119 S.Ct. 1692.*

A.

The Majority states that the constitutional right at issue is whether the law was clearly established that the equal protection clause prohibited a state agency from permitting only mothers, never fathers, to take child-nurturing leave benefits available to the primary care giver for a newborn. **\*644** However, framing the issue in such a manner minimizes and mischaracterizes the nature of the unconstitutional actions at issue. Knussman approached Mullineaux, in her capacity as the Manager of Medical Leave Benefits, to inquire about Maryland's newly promulgated leave law that allowed primary care givers of newborn or adopted children to use accrued sick leave, without certification of illness or disability. The law allowed up to 30 days leave for primary care givers, and ten days leave for secondary care givers. *See* MD. CODE ANN., STATE PERS. & PENS. § 7-508 (1994). The leave statute did

not condition the receipt of benefits on the basis of gender. The statute is gender neutral in text, and provides in pertinent part:

(a) *Primary care givers.*--With the approval of the head of the employee's principal department or other independent unit, an employee who is primarily responsible for the care and nurturing of a child may use, without certification of illness or disability, up to 30 days of accrued sick leave to care for the child during the period immediately following:

(1) the birth of the employee's child; or

(2) the placement of the child with the employee for adoption.

(b) *Secondary care givers.*--With the approval of the head of the employee's principal department or other independent unit, an employee who is secondarily responsible for the care and nurturing of a child may use, without certification of illness or disability, up to 10 days of accrued sick leave to care for the child during the period immediately following:

(1) the birth of the employee's child; or

(2) the placement of the child with the employee for adoption.

*Id.* The statute makes no reference to a distinction on the basis of gender. Nonetheless, in response to Knussman's request, Mullineaux told Knussman that he could not qualify as the primary care giver under the statute because he was a man. Based on these facts, it is imperative that any inquiries into the constitutional violation at issue focus on the liberties that Mullineaux took in her capacity as Manager of Medical Leave Benefits.

The Majority misplaces its focus on comparing Mullineaux's decision to that of legislators and agencies in order to determine the constitutionality of Mullineaux's decision. The Majority concludes that Mullineaux's decision is unconstitutional because she based her decision on stereotypical notions of male/female roles in society. It is true that when analyzing a legislative or state enactment on the basis of gender that the gender classification cannot be based on stereotypical notions, and must be substantially related to the achievement of an important government interest.

However, this is not a situation where the state government or agency arrived at a calculated or reasoned decision to create a gender based statutory distinction to advance an important government interest. *Cf. Heckler v. Mathews, 465 U.S. 728, 744, 751, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984)* (upholding limited gender based spousal benefit statute in order to protect a retiree's reliance on prior provisions struck down as gender based provisions); *Michael M. v. Superior Court of Sonoma County, 450 U.S. 464, 469-71, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981)* (upholding sex-based statutory rape law, which

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

furthered an important government interest of preventing pregnancy); *Rostker v. Goldberg,* 453 U.S. 57, 78-79, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981) (upholding legislative exclusion of women from draft because men and women are not similarly situated for combat). Mullineaux created her own classification that primary care giver equals a woman. By comparing **\*645** Mullineaux's actions to promulgated laws that make gender distinctions, the Majority mischaracterizes the gravity of Mullineaux's actions. Mullineaux engaged in the discriminatory application of Maryland's gender neutral leave statute.

The constitutional right at issue is defined in the plain text of the statute. Knussman had a right not to be discriminated against on the basis of his gender. This inquiry does not require consideration of whether the legislature drew a permissible distinction in law based on gender. The statute is completely devoid of gender classification. Significantly, the nurturing leave statute applies to adoption as well as the birth of a child; therefore, no biological gender classification is implied or inherent in the process of determining whether the leave applicant is a "primary care giver" or a "secondary care giver." In 1994, Knussman sought leave as a primary care giver pursuant to the nurturing leave statute, which provided 30 days leave for primary care givers and ten days leave for secondary care givers for parents of newborns and newly adopted children. Cloaked with the authority as the Manager of Medical Leave Benefits for the Maryland State Department of Police, Mullineaux took it upon herself to interpret this gender neutral statute in a gender specific manner. Mullineaux categorically denied Knussman's request for leave to care for his newborn daughter as a primary care giver because Knussman was a man. Knussman brought suit against Mullineaux, and others, for categorically denying him leave as a primary care giver because of his gender in violation of the Equal Protection Clause of the Fourteenth Amendment. Therefore, for the purpose of analyzing Knussman's claim, this Court must look at a person's right not to have a gender neutral statute applied in a discriminatory manner and determine if such right was clearly established at the time of Mullineaux's actions in 1994.

In 1994, it was clearly established that a person should not be discriminated against on the basis of his gender by having a gender neutral statute applied to him in a discriminatory manner. In order for an identified right to be clearly established, the " 'contours of the right' must be drawn in such a way as to provide notice to a reasonable person in the official's position that his conduct violated the identified right." *Amaechi v. West,* 237 F.3d 356, 363 (4th Cir.2001). By 1994, the Supreme Court conclusively drew the contours of the

right to be free from gender discrimination in employment decisions, which are not substantially related to an important government interest. *See Davis v. Passman,* 442 U.S. 228, 234-35, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (holding it violates the Fifth Amendment due process clause to fire a person because she is a woman); *Caban v. Mohammed,* 441 U.S. 380, 394, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) (holding that sex-based distinctions between unmarried mothers and unmarried fathers, in a domestic relations law provision, are unconstitutional because it bears no substantial relation to any important state interest); *Califano v. Goldfarb,* 430 U.S. 199, 206-7, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977) (holding that a gender based distinction between widows and widowers violates the due process and equal protection clauses because they are based on archaic and over-broad generalizations); *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (noting that the archaic and over-broad generalizations of women could not justify use of gender distinctions). In addition by 1994, the Supreme Court conclusively drew the contours of the right to be free from having a neutral statute applied in a discriminatory manner. *See Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1943) (holding that the unlawful administration of a statute fair on its face, resulting in its unequal **\*646** application, is a denial of equal protection if it is shown to be intentional or purposeful discrimination present); *Yick Wo v. Hopkins,* 118 U.S. 356, 373-74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (holding that it is unconstitutional to administer a law that is fair on its face in an unequal manner). The established Fourteenth Amendment jurisprudence in 1994 protected Knussman's right to receive nurturing leave benefits under a gender neutral leave statute without his gender effecting or impeding such decision. Therefore, the right at issue was clearly established because the contours of the right to be free from discriminatory behavior afforded Mullineaux adequate notice that her interpretation of a gender neutral leave statute, which resulted in the gender based denial of a benefit, violated the Fourteenth Amendment.

B.

A reasonable person in Mullineaux's position would have known that her conduct violated a person's right not to have nurturing leave benefits administered in a discriminatory manner. Mullineaux was the Manager of Medical Leave Benefits. She worked previously at the Maryland State Department of Personnel, and had approximately 15 years of experience in state employment and administrative policy matters at the time of the incident. J.A. 670, 1058. In 1994, a person in Mullineaux's position and with her experience should

have known that Maryland law prohibited her from drawing a distinction on the basis of gender when administering leave benefits to parents caring for their children. Maryland law has made it clear that gender is not a permissible factor in determining the legal rights of a woman or man. *See Burning Tree Club, Inc. v. Bainum,* 305 Md. 53, 501 A.2d 817, 822 (1985); *Condore v. Prince George's Co.,* 289 Md. 516, 425 A.2d 1011, 1015 (1981). Therefore, the treatment of any person by the law may not be based on the mere circumstances that such person is of one gender or the other. *See Burning Tree Club, Inc.,* 501 A.2d at 822.

Maryland's Equal Protection Act flatly prohibits gender-based classifications absent substantial justification, whether contained in legal enactments, government policies, or by application of common law rules. *See State v. Burning Tree Club, Inc.,* 315 Md. 254, 554 A.2d 366, 387 (1989); *Rand v. Rand,* 280 Md. 508, 374 A.2d 900, 903 (1977). Maryland reinforced its mandate of parental equality in 1978 when it unequivocally abolished the maternal preference in child custody cases. *See McAndrew v. McAndrew,* 39 Md.App. 1, 382 A.2d 1081, 1086 (Md.1978). The highest court in Maryland has clearly stated that a parent is no longer presumed to be clothed with, or to lack, a particular attribute merely because that parent is a male or female. *See id.* Despite this unequivocal mandate, which Mullineaux should have been aware of given her experience and position, Mullineaux discriminated against Knussman by assuming that he, as a man, could not have been the primary care giver for his child.

Moreover, a reasonable leave benefits manager would have known to pursue the proper channels at work to determine the parameters of the newly enacted statute. Mullineaux knew that Director of Legislative and Policy Services, John Irick, had the authority to make policy rulings for the Maryland State Department of Police. J.A. 711. Irick knew that the gender-based denial of Knussman's nurturing leave request was discriminatory and illegal. J.A. 423, 425, 429. A reasonable leave benefits manager would have known to confirm the statute's requirements with Irick, prior to giving false information. If promptly asked, Mullineaux could have discovered early on what she should have known: that confining the primary care giver category to women was discriminatory **647** and unconstitutional. Ultimately, a reasonable leave benefits manager should have recognized that she was applying a gender neutral leave statute in a discriminatory manner by making only men prove they were primary care givers to newborn or adopted children. A reasonable person in Mullineaux's position would have known that they were violating Knussman's right to be free from discrimination on the basis of

gender. Therefore, I concur with the Majority's conclusion that Mullineaux is not entitled to qualified immunity.

II.

The district court did not abuse its discretion in finding that the weight of the evidence submitted supported the jury verdict of $375,000 to Knussman. On a Rule 59 motion for a new trial addressing compensatory damages, the trial court must weigh the evidence and consider the credibility of the witnesses to determine whether the verdict was against the clear weight of the evidence or was based upon insufficient evidence. *See Atlas Food Sys. v. Crane Nat'l Vendors, Inc.,* 99 F.3d 587, 594 (4th Cir.1996). If the trial court weighs the evidence and determines that it is deficient to sustain a verdict, then the trial court can set aside the verdict and grant a new trial. *See id.* It is this decision that this Court must review. In reviewing a trial court's decision to uphold a jury verdict, this Court must determine whether the trial court abused its discretion when it ruled that the verdict was not against the clear weight of the evidence and was not based upon false evidence. *See Cline v. Wal-Mart Stores, Inc.,* 144 F.3d 294, 301 (4th Cir.1998). Accordingly, the issue before this Court is whether the district court abused its discretion in finding that the $375,000 award was not against the clear weight of the evidence and was not based upon evidence that was false. Appellate review of the evidence demonstrates that as a result of the violation Knussman has suffered emotional distress and has lost priceless time with his child; therefore, the constitutional violation supports the $375,000 award.

A.

The trial court did not abuse its discretion in finding that the weight of the evidence submitted in support of Knussman's claims of emotional distress supports the verdict. Distress is a component of personal injury that is customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff. *See Carey v. Piphus,* 435 U.S. 247, 263-64, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). When analyzing a claim for emotional distress premised upon a constitutional violation, a court should consider: (1) the degree of emotional distress, (2) the context of the events surrounding the emotional distress, (3) the evidence tending to corroborate the plaintiff's testimony, (4) the nexus between the challenged conduct and the emotional distress, (5) any mitigating circumstances, and (6) medical attention and/or psychological or psychiatric treatment that the plaintiff received as a result of the emotional distress. *See Price v. City of Charlotte,* 93 F.3d 1241, 1254 (4th Cir.1996).

The uncontroverted evidence of three doctors, Knussman's family, and Knussman himself were sufficient for a jury and a trial court to find that the evidence presented to demonstrate Knussman's emotional distress supported the verdict.

First, the record supports Knussman's contention that he suffered a severe degree of emotional distress. Knussman testified that after being denied leave he experienced chest pains and palpitations, depression, loss of enjoyment of activities, loss of sleep, and nausea. J.A. 196, 204-206. In addition, Knussman's wife testified that Knussman had trouble sleeping **648 and was very withdrawn and depressed. J.A. 525, 529. The severity of Knussman's distress is best exemplified by Psychologist Susan Toler's diagnosis of Knussman as having Adjustment Disorder and Major Depressive Disorder. J.A. 560. For example, Dr. Toler described Major Depressive Disorder as a person losing their sense of vitality, their sense of self, their confidence in their own ability to respond to problems, and their ability to enjoy normal or every day ordinary joys. J.A. 560. The Defendants presented no evidence, or contradicting expert testimony that would undermine Dr. Toler's diagnosis. Accordingly, the weight of this evidence supports a finding that the severity of Knussman's distress was substantial.

Second, the events surrounding the emotional distress were significant because the constitutional violation concerned the birth of Knussman's first child, and the severe illness endured by his wife in connection with the birth of their child. During her pregnancy, Mrs. Knussman was diagnosed as having preeclampsia. J.A. 280, 545. This condition extended beyond the birth of their child. If not controlled properly, preeclampsia can cause a triad of swelling, high blood pressure, and protein in the urine. J.A. 280. This process can progress to a point of causing kidney failure, liver failure, or may even become fatal. *See id.* Preeclampsia crippled Mrs. Knussman's ability to function, and to care for her newborn child. Notwithstanding these circumstances, Defendants unconstitutionally denied Knussman extended nurturing leave benefits, and prohibited him from helping his wife to care for their newborn child. Such circumstances surrounding the denial of benefits to Knussman contributed to the significance and gravity of the constitutional violation.

Third, the record is replete with evidence corroborating Knussman's testimony that he suffered distress. Dr. Toler's testimony corroborates the severity of Knussman's emotional distress. On eleven different occasions during a one year span, Knussman visited Dr. Toler for treatment of his emotional distress. J.A.

533-34. Dr. Toler corroborated Knussman's testimony in that she reported that Knussman had symptoms of sadness, anxiety, worry, rumination, depression, restlessness, poor concentration, poor self-esteem, paranoia, and anger. J.A. 547-48, 551, 557. Dr. Toler also acknowledged that Knussman suffered many physical symptoms such as panic attacks, chest pains, racing heartbeat, significant sleep loss, and loss of appetite. J.A. 549-50. In addition, Psychiatrist Lidia Wenz's report further acknowledged that Knussman manifested symptoms of periodic panic attacks of varying severity, hyper vigilance avoidance, and a numbing of emotions. J.A. 1202. Moreover, Knussman's treating physician, Dr. Michael Crowley, provided testimony supporting the contention that Knussman exhibited some of these signs of stress. [FN1] J.A. 316. Three different doctors corroborated Knussman's accounts of distress. Therefore, sufficient credible evidence **649 exists to corroborate Knussman's accounts of emotional distress.

FN1. This is not a situation where the plaintiff failed to produce evidence demonstrating that he suffered an injury. *See, e.g., Carey v. Piphus,* 435 U.S. 247, 263-64, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (holding that a constitutional violation in and of itself is only entitled to nominal damages absent proof of actual injury in a § 1983 suit); *Price v. City of Charlotte,* 93 F.3d 1241, 1245 (4th Cir.1996) (reversing compensatory damages award in § 1983 suit and awarding nominal damages where plaintiffs' emotional distress consisted exclusively of their own conclusory statements); *Hetzel v. County of Prince William,* 89 F.3d 169, 171 (4th Cir.1996) (reversing and remanding excessive compensatory damages award in § 1983 and Title VII suit where plaintiff presented no evidence to corroborate the existence of her specific harms).

Fourth, the nexus between the challenged conduct and the emotional distress is substantial. The challenged conduct at issue is embodied in the jury's verdict that the State of Maryland, Colonel David B. Mitchell, Captain David Czorapinski, First Sergeant Ronnie P. Creel, and Jill D. Mullineaux discriminated against Knussman by denying him leave benefits on the basis of his gender. J.A. 1211. The challenged conduct is the constitutional injury of gender discrimination. Knussman was discriminated against on the basis of his gender when Defendants acted in concert to deny Knussman extended leave benefits. The evidence

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

supports the jury's conclusion that these actions are inextricably linked to the emotional distress experienced by Knussman. The jury heard the testimony of Dr. Toler who connected the emotional distress experienced by Knussman to the overall denial of leave. J.A. 558. Specifically, Knussman's attorney asked Dr. Toler, "Is it your expert opinion that those physical symptoms that [Knussman] was experiencing in 1995 were directly related to the dispute with his employer over leave?" J.A. 550. Dr. Toler responded, "It is my opinion that they are related, [and] that seemed to be the stressor that precipitated an evolution of these symptoms." *Id.* Dr. Toler concluded further that in her professional judgment if Knussman had been granted leave, then these symptoms that he presented would not have existed. J.A. 579, 560. Therefore, the evidence substantially supported the nexus between Knussman's emotional distress and the denial of leave. [FN2]

> FN2. The Majority holds that the clear weight of the evidence does not support a causal connection between Knussman's emotional distress and the constitutional injury. However, as discussed *infra* Part II.C, the Majority's premise for this conclusion is erroneous.

Fifth, the evidence shows that Knussman received medical attention, psychological treatment, and psychiatric treatment as a result of the emotional distress. As noted above, the evidence submitted showed that Knussman received lengthy psychological treatment from Psychologist Dr. Toler for his emotional distress. In addition, Knussman sought the assistance of Psychiatrist Dr. Wenz who found it necessary to place Knussman on medication to control his symptoms of depression. Dr. Wenz placed Knussman on Prozac in an attempt to help increase the levels of serotonin in Knussman's body, which in turn would enhance Knussman's ability to use his body's natural antidepressants. J.A. 569. Therefore, the medical attention and treatment Knussman received was significant to support the jury's verdict for damages.

Ultimately, the weight of the evidence supports the relevant factors to be considered in analyzing an emotional distress claim. Therefore, the district court did not abuse its discretion in upholding the jury's $375,000 damages award.

B.

Even though emotional damages may be sufficient, in and of themselves, to sustain the jury verdict, emotional distress damages were not the only damages requested and awarded in this action. The district court instructed the jury that it could fairly compensate Knussman for any injury caused by the constitutional violation. J.A. 1097-99. This includes the time Knussman lost with his newborn daughter. The Maryland statute at issue recognized the importance of a parent and child bonding in the initial days of a newly born, or newly adopted, child. *See* MD. CODE ANN. § 7-508. The statute implicitly acknowledged the importance of the primary care giver to have up to 30 days leave from work to care for their child. *See id.* By **\*650** limiting him to the ten day secondary care giver leave status, Mullineaux denied Knussman his right to care for his child during her initial days on this earth. The jury was in an appropriate position to determine that Knussman suffered quantifiable damages due to Mullineaux denying him the additional 20 days with his child. *See generally Conner v. Schrader-Bridgeport Internat'l, Inc.,* 227 F.3d 179, 201 (4th Cir.2000) (holding that the district court erred in its determination that irrelevant and prejudicial evidence affected the jury's verdict). It is possible that the jury quantified this pecuniary interest to help contribute to the calculation of the $375,000 award. Accordingly, such a determination further buttresses the district court's discretion to uphold the validity of the jury verdict.

C.

The Majority sets aside the jury's $375,000 verdict and remands the case for a trial on damages because it views the nexus between Mullineaux's actions and the emotional distress experienced by Knussman as "attenuated at best." The Majority reaches this decision based on its view that Knussman's emotional distress was the result of this litigation, not the constitutional injury. This approach is flawed for three reasons. First, the Majority minimizes the constitutional injury at issue by describing the injury as Mullineaux's "slanderous words." [FN3] Second, the Majority utilizes an amorphous standard, which calls for a jury to explain its particular rationale for its proximate cause finding. Third, the Majority implies that the jury mistakenly included litigation related distress within its calculation of damages yet the Majority does not reference any erroneous jury instruction given by the district court which would lead the jury to incorporate litigation related stress [FN4] into damages. As seen below, the Majority's approach does not support the conclusion that the district court abused its discretion in upholding the jury's verdict.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

FN3. Mullineaux told Knussman "Unless your wife is in a coma or dead, you can't be primary care provider."  J.A. 1154, 202-04, 232.

FN4. Defendants raised the issue of non-compensable litigation related stress in its cross-examination of Dr. Toler, J.A. 588, two questions in cross-examination of Dr. Crowley, J.A. 319-320, and several questions to Plaintiff, J.A. 259-263.

1.

The Majority minimizes the constitutional violation at issue.  The Majority contends that the constitutional violation was Mullineaux denying Knussman the same opportunity to qualify for primary care giver status as would be afforded to a mother.   By limiting the constitutional violation to Mullineaux's sole actions, the Majority minimizes the injury thus enabling it to conclude that the verdict was excessive in light of the evidence.  The constitutional violation was gender discrimination.  The jury returned a verdict that stated that David Mitchell, David Czorapinski, Ronnie Creel, Jill Mullineaux, and the State of Maryland all denied Knussman leave under Maryland law because of his gender. J.A. 1211.  Therefore, the actions of all of the Defendants, not just Mullineaux, compromised the constitutional violation.

The record demonstrates that Jill Mullineaux's actions were egregious by themselves.   In response to Knussman's inquiries, Mullineaux, as the Manager of Medical Leave and Benefits, performed a cursory inquiry into the meaning of the statute, then she erroneously informed Knussman that he was only entitled to secondary care giver status.  Subsequently, when Knussman asked a second time if he could receive extended leave as the primary care giver, Mullineaux *651 communicated that the only way that Knussman could qualify for primary care giver status was for his wife to be dead or in a coma.

Similarly, Captain David Czorapinski, participated in the discrimination against Knussman because he initially misinformed Knussman's supervisor that the primary care giver was presumed to be the mother.  Czorapinski subsequently realized that he was misinformed about the presumption of primary care givers being a mother.  Nonetheless, during the grievance procedure Czorapinski maintained this erroneous bias.   This is evident in Czorapinski's statement that "All indicators show that Mrs. Knussman was capable of providing for the care and nurturing of

their child ... there was nothing offered to indicate that she was unwilling or otherwise unable to provide care for the child."  J.A. 1209.  In a less egregious manner, Czorapinski continued to apply the same unconstitutional presumption as Mullineaux:  unless Knussman could show that his wife was incapable of taking care of his daughter, Knussman could not be considered the primary care giver under the statute. The jury also found David Mitchell and Ronnie Creel's actions resulted in a constitutional violation.   The evidence submitted showed that both Mitchell and Creel were privy to all of the information, knew of Czorapinski and Mullineaux's actions, yet failed to act.   J.A. 1118, 1132.    Therefore, the constitutional violation encompassed (1) Mullineaux and Czorapinski's initial joint decision to only allow Knussman two weeks nurturing leave, (2) Mullineaux, Creel, and Czorapinski's subsequent denial of Knussman's request to have his two week nurturing leave extended, (3) Mullineaux's remarks that Knussman's wife had to be dead or in a coma before he could qualify for more leave, (4) Czorapinski's continued application of the unconstitutional gender presumption during the grievance procedure, and (5) Creel and Mitchell's ambivalence and inaction to Knussman even though they were aware of the gender presumption being applied against Knussman.   The jury found Knussman was entitled to $375,000 in damages as a result of a series of actions by all of the Defendants.  J.A. 1211-13.  The damages were not limited to Mullineaux's actions.  Therefore, the weight of the evidence supports the finding that the constitutional injury could have resulted in the damages sustained.

2.

The Majority Opinion creates an amorphous new standard of review for an excessive jury verdict claim, which calls for an appellate court to determine the proportional component of a jury verdict.      The Majority remands this case for a trial on damages because it claims it was not possible to determine what proportion of the verdict was intended to compensate Knussman for emotional damages.  The Majority looks to the precedent of *Carey,* *Hetzel,* and *Price* to support its conclusion that the constitutional violation did not cause emotional distress warranting $375,000 in damages.  *See Carey,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252;  *Hetzel v. County of Prince William,* 89 F.3d 169, 171 (4th Cir.1996);  *Price,* 93 F.3d 1241.

However, in contrast to Knussman's situation, the *Carey,* *Hetzel,* and *Price* decisions focus on cases where the plaintiff failed to show emotional damages.   In *Carey,* several suspended students brought

procedural due process claims against a school district. *See Carey,* 435 U.S. at 263-64, 98 S.Ct. 1042. The plaintiffs put no evidence in the record to show what damages, if any, they sustained as a result of the constitutional injury. The record was completely devoid of any evidence that could form the basis for measuring the extent of their injuries. Ultimately, the *Carey* Court held that absent proof of actual injury from the constitutional **\*652** violation, the students were entitled to recover only nominal damages. *See id.* at 264, 98 S.Ct. 1042. Similarly, in *Hetzel,* this Court found that the record was devoid of evidence to show that the plaintiff suffered an actual constitutional injury. *See Hetzel,* 89 F.3d at 172. In *Hetzel,* a Hispanic female police officer brought suit against the county and police chief alleging harassment and discrimination on the basis of sex and national origin. Hetzel's evidence concerning the emotional distress consisted almost exclusively of "Hetzel's own brief, conclusory statements--compromising less then ten pages of a joint appendix exceeding 5,000 pages--that she had headaches, stress, trouble reading to her daughter, and problems with her family life as a result of appellants' actions." *Id.* at 171. She presented no evidence corroborating specific harm, she continued to perform her duties without a noticeable diminution in performance, and she never saw a doctor, therapist, or other professional. The Court held that the $500,000 award was grossly excessive in light of the limited evidence of harm presented at trial. *See id.* (holding that the award must be proportional to the actual injury incurred and must focus on the real injury sustained). In addition, in *Price,* this Court reversed the plaintiff's award of compensatory damages due to the insufficiency of the evidence. *See Price,* 93 F.3d at 1250. Several White police officers sued the city contending that its race-based promotion policy for police sergeants violated the equal protection clause. At trial, plaintiffs proffered only vague, conclusory testimony concerning their injury. In sum, the police officers said that they suffered feelings of betrayal and humiliation. *See id.* at 1254. This Court held that the police officers' testimony simply failed to show any demonstrable emotional injury. *See id.* at 1254-55. Accordingly, the Court reversed the $3,000 compensatory award damages and awarded $1 in nominal damages. Ultimately, the issues focused upon in *Carey, Hetzel,* and *Price* are distinguishable from the case at hand. As demonstrated above, Knussman presented overwhelming and uncontroverted medical and non-medical evidence demonstrating that he suffered emotional distress.

The jury was capable of determining that the constitutional violation caused Knussman's injuries. It is well settled that causation is ordinarily left for a jury

to determine. *See Exxon Co., USA v. Sofec Inc.,* 517 U.S. 830, 840-41, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996) (holding that the issue of proximate causation involves application of law to fact, which should be left to the fact finder, subject to limited review); *Conner,* 227 F.3d at 201 (holding that the district court erred by overturning the jury's verdict based on its determination that irrelevant and prejudicial evidence affected the verdict); *Aravanis v. Eisenberg,* 237 Md. 242, 206 A.2d 148, 158 (1965) (holding that violations and proximate cause of injury were questions of fact properly left for the jury's determination). Dr. Toler specifically and repeatedly connected the emotional distress experienced by Knussman to the overall denial of leave. J.A. 550-58. After weighing the testimony of the witnesses, and examining the evidence, the jury concluded that Knussman was entitled to compensatory damages in the amount of $375,000. Medical and eyewitness testimony within the record supports the jury finding that Knussman's injury resulted from the constitutional violation. No reason exists to doubt the jury's determination and quantification of compensation for Knussman.

The Majority is not satisfied with the jury's determination that the constitutional violation caused the injury, even though the Majority acknowledges that Knussman produced sufficient evidence of actual injury. The Majority seeks some proportional **\*653** or mathematical formula for the determination of compensatory damages. The Majority describes the connection between the constitutional injury and the emotional distress as "attenuated at best." Attenuated means weak or thin. *See* RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (2nd Ed.1987). However, Knussman presented medical testimony specifically connecting the constitutional violation and the emotional distress, and the defense presented no evidence of malingering or overreaching by Knussman. *See supra* Part II.A. Therefore, the Majority creates a standard that uncontroverted medical testimony affirming the connection between the injury and emotional distress is insufficient as a matter of law.

The Majority's position requires the fact finder to pinpoint and articulate precisely where the plaintiff's emotional distress over the constitutional injury ends, and the emotional distress over the impermissible factor, i.e., the litigation related distress, begins. This is not, and should not be, a prerequisite to sustain a damage award under § 1983. A court of review reviews the record to determine if the clear weight of the evidence supports the verdict. *See Cline,* 144 F.3d at 301. It is only necessary for plaintiffs to demonstrate, and the jury to find, that a casual connection between the constitutional violation and the plaintiff's demonstrated injury in order to recover

compensatory damages. *See Price,* 93 F.3d at 1251 (citing *Gore v. Turner,* 563 F.2d 159, 164 (5th Cir.1997)). Therefore, a district court does not abuse its discretion if it upholds a jury verdict where the evidence presents sufficient proof of a constitutional violation, injury, and a casual connection between the injury and constitutional violation. Knussman has produced sufficient evidence of causation. As demonstrated above, the clear weight of the evidence, in the form of Dr. Toler's testimony, demonstrates a strong link exists between the constitutional violation and the emotional distress experienced by Knussman. Therefore, legally sufficient evidence existed for a reasonable jury to have reached its verdict.

3.

Nothing within record shows that the jury considered litigation related distress as a factor in damages. The Majority remands for damages because in its view the jury factored litigation related distress into its calculation of damages. Defendants had the opportunity to cross-examine Dr. Crowley and Dr. Toler on the issue of litigation related distress. J.A. 319-20, 571-80, 588. In particular, Dr. Toler admitted that the lawsuit was stressful on Knussman because it tended to magnify the events, circumstances, and adversarial relationship that had developed over the course of the years. J.A. 571. Notwithstanding this testimony, it remains possible that the jury found the emotional distress due to the constitutional injury, not due to litigation, caused the injury. Defendants stressed to the jury during the trial that Knussman could not recover damages for litigation related distress. [FN5] Moreover, the district court's instructions were clear that Knussman could only recover for damages sustained by the constitutional injury itself. J.A. 1097-98. The Majority references no erroneous instruction given by the district court, which would confuse the jury into incorporating litigation related distress as recoverable damages. *See, e.g., Memphis Community Sch. Dist. v. Stachura,* 477 U.S. 299, 306, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) (reversing jury's verdict because the trial judge gave an erroneous jury instruction **\*654** allowing the jury to compensate the plaintiff for circumstances that should not be compensated). The Majority simply implies that it is not comfortable with the jury's ability to weigh the credibility of the witnesses, or the trial judge's ability to utilize its discretion, and reach its conclusion that Knussman's injuries resulted from the constitutional violation. The Majority has no reason to infer or imply that the jury improperly calculated litigation related distress into its $375,000 damages determination. The Majority should not set aside the jury's verdict as excessive because it cannot succinctly enunciate clear

principles for assessment of whether a verdict for compensatory damages, including the medical and emotional distress components, is excessive as a matter of law. Accordingly, the district court's decision upholding the jury's award should be affirmed. Therefore, while I concur in the judgment, I respectfully dissent in the decision to remand the case for a trial on damages.

> FN5. It is important to note that Defendants did not present any contrary medical evidence showing that Knussman's distress resulted from the litigation.

272 F.3d 625, 81 Empl. Prac. Dec. P 40,804, 7 Wage & Hour Cas.2d (BNA) 710

Briefs and Other Related Documents (Back to top)

• 2000 WL 33989544 (Appellate Brief) Reply Brief of Appellants (Nov. 03, 2000)Original Image of this Document (PDF)

• 2000 WL 33989545 (Appellate Brief) Brief of the Appellee (Oct. 03, 2000)Original Image of this Document with Appendix (PDF)

• 2000 WL 33989546 (Appellate Brief) Brief of Appellants (Aug. 14, 2000)Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works